Hillsborough,
No. 5392.

SANDRA CHRISTIAN & a. v. ALLEN K. ELDEN & a.

Argued April 5, 1966.
Decided June 30, 1966.

*Earley & Flynn* ( *Mrs. Margaret Q. Flynn* orally ), for the plaintiffs.

*Hamblett, Kerrigan & Hamblett* ( *Mr. Joseph M. Kerrigan* orally ), for the defendants.

*Sheehan, Phinney, Bass & Green (Mr. William L. Phinney* orally), for the Horsemen's Protective Association, as amicus curiae.

BLANDIN, J. The underlying issue here is whether the Court erred in denying the defendants' motions for nonsuits and directed verdicts which were based on the proposition that the evidence did not warrant a finding that Hans Kreis was negligent. On the record, the jury, considering the evidence and all reasonable inferences therefrom most favorably to the plaintiff (*Zellers* v. *Chase*, 105 N. H. 266, 268; see also, *Leonard* v. *Manchester*, 96 N. H. 115, 117) could find the following:

The minor plaintiff, Sandra Christian, had been riding horses for some ten months before the accident. On the day in question, she had been mounted on a horse named May, which she had only ridden two or three times before. The riding instructor Kreis told her to trot the horse and then stop at certain markers. Sandra was not able to stop at these points. She "had a hard time" generally managing May and was having difficulty with the horse at all the stops. When Kreis saw this, he instructed Sandra to get off the horse. At that time, she was "a little bit scared" and told him so. He then asked a young girl named Sally, a companion of Sandra's, to mount May, and she did so, merely walking the horse around. He had Sally dismount and told Sandra to get on. She did, but said to him she was "a little bit scared" and didn't wish to get back on the horse. She had no recollection of ever having told Kreis before that she was scared. He instructed her that the only way to learn was to get "right back up." She did so, and he immediately instructed her to canter — a fast pace, speedier than a trot, but not so fast as a gallop. This was the first time that day that she had cantered. The horse began to go too fast. "She just kept going and I tried to stop her and I couldn't." Kreis stood in the middle of the ring watching the performance. Sandra knew she had lost control and that May was going much too fast. She sat back in the saddle, tightening and loosening the reins and saying "Whoa." After she had gone around the ring twice, she was thrown off as the horse was turning the southwest corner of the ring. May kept going until Kreis grabbed her. Sandra screamed as she fell and then Kreis told her to "shut up" as she was "making a scene for the neighbors."

In learning to ride, the pupil is first taught to walk the horse

while the teacher holds the longe rope hitched to the animal. Next the pupil is taught to trot and then to canter. The lessons should be given in progressive steps. As the pupil masters one step, he passes on to the next and more difficult one. This had been the procedure followed with Sandra during her some ten months of receiving instruction.

Although May was ordinarily a safe and willing horse, it is also true that horses are moody and have off days when they are not suitable for many persons to ride, as Kreis himself testified. On this same day, May's companion horse April, who, too, was ordinarily a calm and good animal, was having a poor day, and shortly before the accident she had performed so badly with Sally that Kreis had taken the horse to the barn.

Without further detailing the evidence on this issue, we believe that reasonable persons could have concluded that Kreis, seasoned and experienced horseman and teacher, knew that this young pupil was scared and was having trouble in controlling May, even when the horse was only walking. He knew that even the best of horses are moody and at times unfit to ride, and he had just stabled April for this very reason. May had already given indications that she, too, was skittish and difficult to manage even at a walk — the mildest and safest of gaits. Notwithstanding this, Kreis instructed Sandra to mount and to immediately put the horse into a canter. In her two trips about the ring, there were indications that May might be or was about to become out of Sandra's control. Even in the face of this, the defendant Kreis did nothing. In all the circumstances, the finding that this experienced horseman was negligent in his conduct toward the fourteen-year-old plaintiff was warranted, and the defendants' exceptions to the denial of their motions for nonsuits and directed verdicts are overruled.

The claim by the defendants, and stressed by amicus curiae, that the plaintiff should have introduced expert testimony on this question, does not require extended consideration. We believe that the facts before the jury were of such a nature that no expert testimony was required. *Mehigan* v. *Sheehan*, 94 N. H. 274; *Dunham* v. *Stone*, 96 N. H. 138, 140; see also, McGuire, Common Sense and Common Law 30.

Another issue argued by the defendants Elden is that if Kreis should be found negligent, this cannot be charged to them under the theory of apparent agency. See Restatement ( Second ), Agency, *s*. 8. Upon this question, these facts could have been found:

The defendant Eloise Elden, wife of Allen, was the joint owner with her mother of the premises on South Main Street in Nashua, where the riding school which the plaintiff was attending was located. After she married Allen, they lived on the premises together and she allowed him to build a riding ring there. This was in 1941, and there has been a riding ring there every since. Subsequent to the construction of the first ring, another and better one was built, shortly after Kreis came to Nashua in 1957. The Eldens had been well known in that city and in surrounding towns for years as running a riding school, having horses and giving lessons. Sandra's mother and the co-plaintiff, Edna M. Christian, had lived near the Eldens for years, and remembered them as running a riding school there as long as she could remember, probably "twenty years." Mr. Elden had a reputation for being in the horse business, and the riding school on these premises was the only one in Nashua.

At the time Sandra was hurt, there were nine horses in the Elden stables, four owned by him and five being boarded. Riding horses had been available there for some eighteen years, and people had used them. As the defendant Allen testified, " There was no other place where people could learn better riding and I have tried to introduce better riding into this area, that is why I kept horses. " Before Kreis came to teach riding, a man named Wolff, a world famous teacher, instructed at the Elden stables for about ten years, and before him a woman had taught for some five years. Prior to Wolff's era, Allen himself had given lessons.

There was a sign at the corner of South Main Street and Anders Lane, where the Eldens lived and where the school was conducted, which was within sight of their home. It hung from an iron post and had the word "Elden" at the top. Underneath this in somewhat larger print were the words "Riding School," and at the bottom were the words "Nashua," "Lessons by Appointment," and the Eldens' telephone number. The sign which had been used previously was painted over by Kreis before the accident, and the defendant Allen had hung it up. Allen had a Ford truck and trailer that he used in a horse shoeing business which he conducted, and both the truck and trailer had the words "Elden Riding School" painted on them, together with a painting of three horses. Kreis had done this as a present to the Eldens, and they had both approved his putting the words "Elden Riding School" on both vehicles.

Kreis lived at the Eldens' house, took his meals there, and in return fed the horses at noon and cared for them when Allen was away. Kreis kept all the money which he obtained from teaching the riding lessons, and the Eldens received no part of it. However, Kreis appeared to consider the Eldens as a "team." He testified of coming "to work for the Eldens," and of having a "standing invitation from the Eldens" to teach riding at their school "if no one else had my place." Mrs. Elden answered the telephone when people called for appointments for riding lessons. She summoned Kreis to the phone if he were there, or if not, she would take the name of the caller and check with Kreis to see what time would fit his schedule. Neither she nor her husband ever told anyone at any time, including Sandra and her mother or Sally, that it was not the Eldens' riding school or that they had nothing to do with it. Mr. Elden told people that Kreis was at his place teaching riding and invited them to see his horses. On the defendants' 1959 income tax, which was prepared by an accountant, there was typed in Schedule C under the heading "Principal Business Activity," the words "Blacksmith and Riding School."

Sandra "assumed that it [the riding school] was run by the Eldens" and that Kreis "just taught lessons . . . for the Eldens." While Sandra was having lessons, Mrs. Elden sometimes came out and watched. Sandra's mother "knew" that the Eldens were running the riding school. "I knew they were established in the riding school business and I could depend on them to run a good riding school." She believes that Kreis was running the school for the Eldens. Sandra had been teasing her mother to let her take lessons. Finally Mrs. Christian told her daughter to call Mrs. Elden and see about making arrangements to take lessons.

Drawing all reasonable inferences from these facts, the jury could conclude that ( 1 ) Sandra and her mother were led to a reasonable belief that the Eldens ran the riding school; ( 2 ) relying upon this and believing that Kreis was giving lessons in their behalf, Sandra was entrusted to Kreis' care and was injured by his negligence. This is sufficient under our law to warrant the jury in finding the Eldens both liable. *Manning* v. *Company*, 90 N. H. 167, 170; *Getlar* v. *Rubinstein*, 11 N.Y.S. 2d 943 ( Sup. Ct. ) 16 N. Y. S. 2d 527; see *Record* v. *Wagner*, 100 N. H. 419.

The defendants assign error because the Court failed "to charge more specifically that, in the absence of a real agency relationship

between Kreis and the defendant," the minor plaintiff could not recover "unless she actually relied on any alleged representation of such defendant that Kreis was authorized to act for him or her." Upon this subject the Court, after instructing the jury at some length as to the liability of a principal for the negligent acts of his agent, and also that of a master for his servant, charged them as follows:

"Now, at the risk of being repetitious, I am going to go back over this element of apparent authority again. Now, if the plaintiff, Sandra Christian, took riding lessons at the Elden Riding School, believing that the defendants ran the school and relying on the premise and believing that Mr. Kreis was an agent or employee of the Eldens and if such belief was based upon the Eldens permitting this riding school to appear to be run by them, their permitting Kreis to appear their agent or employee, and the plaintiff was injured by reason of the negligence of Kreis and there was not any contributory negligence on the part of the plaintiff, then the defendants are liable for the negligence of Mr. Kreis — even if in fact he was not an agent or employee of the defendants, provided the plaintiff, Sandra Christian, as I stated before, was in the exercise of due care."

Viewing the charge in its entirety and in the light of the course of the trial ( *Cyr* v. *Sanborn*, 101 N. H. 245 ), we believe that the instructions of which the defendants complain adequately covered the applicable law. *Manning* v. *Company*, 90 N. H. 167, 170. Accordingly, the exceptions are overruled. *Cyr* v. *Sanborn, supra.*

Another assignment of error by the defendants is that the Court did not, in his charge, specifically take from the jury the issue of "the personal negligence of Allen Elden and/or Eloise Elden." No such negligence as this was claimed in the plaintiff's writ. The record discloses that the case was tried on the theory of Kreis' negligence being imputable to the Eldens because of his apparent authority. In these circumstances, it was not only unnecessary for the Court to interject this instruction ( *Lynch* v. *Sprague*, 95 N. H. 485, 490 ), but it might well have been confusing to the jury. We therefore overrule these exceptions.

The defendants also argue that the Court's refusal to give their request No. 4 was error. This request reads: "The plaintiff may not recover simply because she sustained a fall from a horse belonging to either defendant." In regard to this, the Court

explained to the jury the meaning of the burden of proof and the fact that to recover, the plaintiffs must sustain this burden and prove negligence. He also added: "Now, just because a lawsuit has been brought and somebody has been injured does not necessarily mean that there should be recovery." It was not essential that the Court use the exact phraseology of the request. *Mutterperl* v. *Lake Spofford Hotel*, 106 N. H. 538, 544; *Smith* v. *Railroad*, 88 N. H. 430. The fundamental principle which the defendants sought to have laid before the jury was adequately covered in the charge as given, and the defendants cannot prevail on this exception. *Davis* v. *State*, 94 N. H. 321, 323.

What we have already decided appears to cover the majority of the arguments advanced by the defendants, as well as those of amicus curiae. The suggestions that a livery stable owner does not insure the absolute safety of a person to whom he rents a horse and that a riding instructor is not "an insurer of the absolute safety of a pupil" are, of course, true, since our general rule and the one applicable here is that liability is only imposed for causal negligence. *King* v. *Association*, 100 N. H. 212, 217. True, too, is the argument that *scienter* on the part of the defendant is generally necessary to warrant recovery for a display of temper or other dangerous characteristics by an animal. *Bolduc* v. *Crain*, 104 N. H. 163; 2 Harper & James, The Law of Torts *p.* 835. However, these authorities are inapposite to this case. This was not a bailor-bailee situation nor one wherein liability was predicated upon unexpected and unforeseen vicious actions of the horse May. The case was tried and submitted to the jury on the theory that a riding teacher of great skill and experience failed to take reasonable care to protect a fourteen-year-old, frightened pupil from dangers to which she was obviously exposed. For reasons already discussed, we hold that the jury's finding that Kreis' negligence caused Sandra's injuries is sustainable on the record.

A further statement by amicus curiae that everyone who mounts a horse should realize that he may fall or get thrown off is, of course, sound. However, this cannot relieve the defendants from liability for falls caused by their negligence.

It cannot be said that there was no evidence to support the verdicts or that the Court fell into a plain mistake, and therefore the motions to set aside the verdicts cannot prevail. *Powell* v. *Gagne*, 102 N. H. 256, 257.

This appears to dispose of all issues, and there being no error in the trial, the order is

*Judgment on the verdicts.*

All concurred.